[No. B166700. Second Dist., Div. Two. Apr. 21, 2004.]

In re RUDY F., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
RUDY F., Defendant and Appellant.

## Counsel

Kiana Sloan-Hillier, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Jeffrey B. Kahan and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BOREN, P. J.**—Rudy F., a minor, appeals from the order declaring him a ward of the court (Welf. & Inst. Code, § 602) upon a finding that he received stolen property (Pen. Code, § 496, subd. (a)) and gave false information to a peace officer (Pen. Code, § 148.9, subd. (a)), based upon his admission entered after denial of his motion to suppress evidence under Welfare and Institutions Code section 700.1. The juvenile court committed appellant to the custody of the probation officer for placement in the Community Camp Placement Program for a period of four months. Appellant contends that the juvenile court erroneously denied his motion to suppress evidence obtained during a search of his residence.

Appellant lived with his sister in her house in Palmdale. Sheriff's deputies searched the house and found guns and ammunition hidden under a mattress in the sister's bedroom. The trial court found that consent for the search was not voluntary, and that ruling is not challenged on appeal. But the trial court also ruled that appellant had no legal standing to contest the search of his sister's bedroom. We hold that appellant, as a resident of the family dwelling, had a legitimate expectation of privacy in the residence and reverse.

### MOTION TO SUPPRESS EVIDENCE

Pursuant to Penal Code section 1538.5, appellant brought a motion to suppress evidence.[1] At the hearing, before introducing evidence, the prosecutor asserted that she did not believe appellant had standing to challenge the

---

[1] The motion was initially addressed only to the receipt of stolen property allegation. After the juvenile court's ruling, the parties stipulated that it also applied to the allegation of giving false information to a peace officer.

legality of the search because the seized property was found in the bedroom his sister and her boyfriend shared. The defense argued that appellant resided at the searched property and was charged with a crime, which gave him standing. The juvenile court took the standing issue under submission, to be decided after hearing the evidence.

*The prosecution's evidence.*

On February 23, 2003, Los Angeles County Deputy Sheriff Sean Calvo and his partner, Deputy Buckley, went to 39322 10th Street East, in Palmdale. William M. resided there with his girlfriend, appellant's sister, Evelyn F. William M. answered the door. Four or five children were in the house when the deputies arrived. Deputy Calvo asked for permission to enter and search, as he had received information there were stolen firearms in the residence or the garage. William M. responded that he wanted to wait until Evelyn F. returned, because it was also her house.

After waiting five or 10 minutes, William M. telephoned Evelyn F. to find out what he should do. He gave the telephone to Deputy Calvo, who explained why he was there. Evelyn F. told him to wait and stated she would be home in 10 or 15 minutes. The deputies waited approximately an hour, but Evelyn F. failed to return. At that point, Deputy Calvo asked William M. if he would sign a consent to search, which he did. Neither Deputy Calvo, Deputy Buckley nor another deputy who had arrived at the scene made any threats in order to induce William M. to sign.

After signing the consent form, William M. took the deputies to the garage and then to appellant's bedroom, where they found nothing. He next led them to the bedroom he and Evelyn F. shared, where, under the mattress, the deputies found three guns, one matching the description of the victim's shotgun, another inside a case bearing the victim's initials, and a third gun. They also found a package of shotgun rounds.

Near the end of the search, Evelyn F. arrived home. She told the deputies that they had to leave. Deputy Calvo told her they were almost done, and she told them to finish, which they did within five or 10 minutes.

*The defense's evidence.*

William M. testified that he lived at 39322 10th Street East, which Evelyn F. owned. On February 23, 2003, his 10-year-old stepdaughter, Nadine M., answered the door when the deputies arrived. Neither Nadine M. nor William M. invited the deputies into the residence. William M. and Evelyn F.'s four children and two children of neighbors were in the residence

at that time. Deputy Calvo told William M. that a neighbor saw someone bringing guns through the garage, they were looking for appellant, and they had probable cause to search the residence. William M. informed the deputies that appellant was not there. When William M. telephoned Evelyn F., Deputy Calvo spoke with her and was told to wait until she arrived home.

After waiting a bit longer, Deputy Calvo told William M.: "If you don't sign [the consent to search form], we can take your kids away," and the deputies took out four booking forms "so they could start filling them out, [to] take the kids away."[2] William M. told the deputies that he needed to speak with Evelyn F. first, but he was unable to reach her when he telephoned her again. Frightened that his children would be taken, he signed the consent form a few minutes later. When he did so, the section indicating the places to be searched and the items sought were blank, and only the residence address was listed.

The deputies searched the house and garage. When Evelyn F. arrived home, she asked them for a warrant and was told they did not require one because William M. had consented. The guns were found in the bedroom shared by William M. and Evelyn F., under the mattress.

Nadine M. and a neighbor's child, who were at the residence during the search, testified substantially corroborating William M.'s testimony, specifically regarding the purported threat by the deputies to take the children.

Evelyn F. testified for the defense that appellant, 15 years old, had lived with her since he was seven and "had access to the entire house." On February 23, 2003, she was at the market when she received the telephone call from William M., who said that the police were at her home and wanted to speak with her. She asked Deputy Calvo if he had a search warrant, and he said he did not, "But if you want one that's fine. I'll [] just sit here and wait until somebody else gets me one." She told him he did not have permission to search, and to wait until she returned. She called her attorney, who told her that it was her right to insist on a search warrant. When she arrived home, she told the deputy that her attorney said that he needed to obtain a search warrant. Deputy Calvo claimed there was no need to do so because William M. had signed a consent.

*The juvenile court ruling.*

The juvenile court stated: "The court has heard the entirety of the evidence, and two things are very clear. The first thing is it is very clear that the consent

---

[2] According to the defense testimony, the booking forms were left at Evelyn F.'s residence when the deputies left. The forms were admitted in evidence at the hearing.

given in this case by [William M.] was not free, nor was it voluntary. It was a clear violation, the court believes, of the search and seizure laws in this case. That's one. [¶] Two, the second issue, is despite the fact that the search and seizure in this case was unlawful, the court does not believe that [] Rudy F. had standing in this case given the totality of the circumstances presented to this court, and based on the authorities that the court relied upon. As a result, the motion to suppress pursuant to Welfare and Institutions Code section 700.1 will be denied."

After the juvenile court ruled, appellant admitted the allegations that he received stolen property and gave false information to a peace officer.

## DISCUSSION

Appellant's sole contention is that the juvenile court erred in ruling that he lacked standing to challenge the legality of the search of his home. He argues that he had standing because he "is a permanent resident and family member in the residence searched by police. It is the home he grew up in, having lived there with his sister and legal guardian [Evelyn F.], for eight years prior to the search."

Respondent counters by asserting that even if appellant resided with his sister, he had no reasonable expectation of privacy in her bedroom and, hence, lacked standing to challenge the legality of the search. Moreover, even if he had standing and the search was illegal, the seized evidence was admissible by virtue of the inevitable discovery doctrine because Deputy Calvo stated, in response to Evelyn F.'s inquiry as to whether he had a search warrant, "No, I don't. But if you want one that's fine. I'll [] just sit here and wait until somebody else gets me one." Respondent's contentions lack merit.

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729]; see also *In re Brian A.* (1985) 173 Cal.App.3d 1168, 1173 [219 Cal.Rptr. 361].)

I. *Voluntariness of consent.*

 Where the prosecutor relies on consent to a search, the prosecutor has the burden of establishing that consent given for a search was freely and

voluntarily given. (*Bumper v. North Carolina* (1968) 391 U.S. 543, 548 [20 L.Ed.2d 797, 88 S.Ct. 1788].) Here, the juvenile court found that that burden was not met as "the consent [to search] given in this case by [William M.] was not free, nor was it voluntary. It was a clear violation, . . . of the search and seizure laws . . . ."[3] This finding is not challenged on appeal.[4]

## II. *Standing.*

■ Despite finding the search to be illegal, the juvenile court nonetheless denied appellant's suppression motion, ruling that he lacked standing to challenge the validity of the search. The issue of first impression presented here is whether a child residing with his family has standing to challenge a search of his home which yields evidence used against him, seized from the bedroom of a parent or guardian. We answer this question in the affirmative.

■ Since the adoption of Proposition 8, California's prior adherence to the vicarious exclusion rule, under which a defendant had standing to object to the introduction of evidence seized in violation of the rights of a third person, is no longer applicable, and a defendant's right to object to the seized evidence is controlled by federal law. (*In re Lance W.* (1985) 37 Cal.3d 873, 886–887 [210 Cal.Rptr. 631, 694 P.2d 744]; Cal. Const., art. I, § 28, subd. (d).) Federal law provides that Fourth Amendment rights are personal and may not be vicariously asserted. (*Rakas v. Illinois* (1978) 439 U.S. 128, 133–134 [58 L.Ed.2d 387, 99 S.Ct. 421].) The question of whether a defendant has standing to challenge a search is a question of "whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it." (*Id.* at p. 140.) In other words, in order to challenge a search or seizure, the defendant must first establish the search or seizure "infringed an interest of the defendant which the Fourth Amendment was designed to protect." (*Ibid.*) This is established when a defendant meets his or her burden of establishing a legitimate expectation of privacy in the area searched. (*Rawlings v. Kentucky* (1980) 448 U.S. 98, 104 [65 L.Ed.2d 633, 100 S.Ct. 2556]; *United States v. Salvucci* (1980) 448 U.S. 83, 91–92 [65 L.Ed.2d 619, 100 S.Ct. 2547]; *Mancusi v. DeForte* (1968) 392 U.S. 364, 368 [20 L.Ed.2d 1154, 88 S.Ct. 2120] ["capacity to claim the protection of the [Fourth] Amendment depends

---

[3] The juvenile court's finding was legally justified. Acquiescence to a claim of lawful authority, such as a false claim that a peace officer possesses a warrant to search, is coercive. (*Bumper v. North Carolina, supra,* 391 U.S. at pp. 548–549.) It is even more coercive for peace officers, in uniform and acting under color of law, to suggest that they have authority to remove a resident's children if the resident refuses to sign a consent to search form.

[4] Respondent states: "[F]or purposes of this appeal, respondent will assume that one of the deputies did communicate to [William M.] the possibility of removing the children from the premises."

not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion"]; *People v. Jenkins* (2000) 22 Cal.4th 900, 972 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) What a defendant must show is " 'an actual (subjective) expectation of privacy . . . .' [and that the expectation is] 'one that society is prepared to recognize as "reasonable." ' " (*Smith v. Maryland* (1979) 442 U.S. 735, 740 [61 L.Ed.2d 220, 99 S.Ct. 2577].)

■ There is no set formula for determining whether a person has a reasonable expectation of privacy in the place searched, but the totality of the circumstances are considered. (*People v. Koury* (1989) 214 Cal.App.3d 676, 686 [262 Cal.Rptr. 870].) Among the factors sometimes considered in making the determination are whether the defendant has a possessory interest in the thing seized or place searched (*ibid.*), "whether he has the right to exclude others from that place; whether he has exhibited a subjective expectation that it would remain free from governmental invasion; whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises." (*United States v. Briones-Garza* (5th Cir. 1982) 680 F.2d 417, 420.)

■ The rationale at the core of the Fourth Amendment search and seizure protection is the sanctity of the home. " '[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " (*People v. Camacho* (2000) 23 Cal.4th 824, 831 [98 Cal.Rptr.2d 232, 3 P.3d 878].) It " 'is the archetype of privacy protection secured by the Fourth Amendment. In general a home may not be searched without a warrant notwithstanding probable cause' " (*In re Gregory S.* (1980) 112 Cal.App.3d 764, 774 [169 Cal.Rptr. 540]), and warrantless arrests within the home are proscribed unless exigent circumstances exist. (*People v. Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333].) Because the sanctity of the home is at the vortex of the Fourth Amendment, its protection is not narrowly limited to the four walls of the residence, but even extends to its curtilage. (*People v. Mayoff* (1986) 42 Cal.3d 1302, 1314 [233 Cal.Rptr. 2, 729 P.2d 166].) "At the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable." (*United States v. Karo* (1984) 468 U.S. 705, 714 [82 L.Ed.2d 530, 104 S.Ct. 3296].)

Even a mere house guest " 'has a legitimate expectation of privacy in the home where he is staying because that residence has become his substitute home both in his own mind and in the mind of his host.' " (*People v. Cowan* (1994) 31 Cal.App.4th 795, 799 [37 Cal.Rptr.2d 469], quoting from *Minnesota v. Olson* (1990) 495 U.S. 91, 99 [109 L.Ed.2d 85, 110 S.Ct. 1684];

see also *U.S. v. Shy Heath* (6th Cir. 2001) 259 F.3d 522 [defendant has standing to challenge search of a cousin's apartment where defendant slept on the couch as often as once a week for two years, possessed the key that allowed unfettered access to the apartment and the ability to admit and exclude others]; *United States v. Robertson* (9th Cir. 1979) 606 F.2d 853, 858, fn. 2 [overnight guest has standing]; *Holloway v. Wolff* (8th Cir. 1973) 482 F.2d 110 [suspect has standing to challenge search of house where suspect was friend of owner and visited twice a week].)

The justification for according a house guest standing has been artfully articulated by the United States Supreme Court in *Minnesota v. Olson* (1990) 495 U.S. 91 [109 L.Ed.2d 85, 110 S.Ct. 1684], as follows: "[S]tatus as an overnight guest is alone enough to show that [a person] had an expectation of privacy in the home that society is prepared to recognize as reasonable. . . . [¶] . . . [¶] From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. . . . [¶] That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The house guest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises. . . . [H]osts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household. If the untrammeled power to admit and exclude were essential to Fourth Amendment protection, an adult daughter temporarily living in the home of her parents would have no legitimate expectation of privacy because her right to admit or exclude would be subject to her parents' veto." (*Id.* at pp. 96–97, 99–100.)

If overnight guests have standing to challenge a search of the residence they are visiting, it is clear that, for many of the same reasons, "[f]amily members regularly residing upon the premises, though not parties to the legal arrangements concerning who has the possessory interest in those premises, also have standing of essentially the same dimensions." (5 La Fave, Search and Seizure (3d ed. 1996) § 11.3(a), pp. 124–125.) "Unquestionably, a spouse of the person with the possessory interest also has standing as to the premises if that spouse also resides there, as do offspring who likewise make those premises their home." (*Ibid.,* fn. omitted.) In *Bumper v. North Carolina, supra,* 391 U.S. 543, where the defendant lived with his grandmother who owned the residence, the United States Supreme Court stated that "there can

be no question of the petitioner's standing to challenge the lawfulness of [a] search" of the residence during his absence. (*Id.* at pp. 546, 548, fn. 11.)

Relying on cases requiring that an accused have a legitimate expectation of privacy *in the area searched* in order to have standing (see, e.g., *People v. Jenkins, supra,* 22 Cal.4th at p. 972), respondent argues that appellant did not have such an expectation in the bedroom shared by his sister and her boyfriend. Respondent asks us to parse out the different sections within a home where some members of the family, by virtue of internal familial rules, may not consider their private area or may even be precluded from going. We decline to do so as it would undermine the historic constitutional significance of the home. While family members, particularly children, may have family rules that prohibit them from frequenting certain areas of their home, i.e., their parents' bedroom or bathroom, the formal living room, or the mother's good china closet, such rules are not for the government's benefit and do not justify intrusion into those areas. As against government intrusion, family members have an expectation of privacy in their entire home. It would be intrusive, unwise, and impractical to make expectation of privacy against government intrusion turn on the various family uses of different areas in the home.

Respondent argues that appellant's probation report states that he was a runaway from his sister's home for extended periods, as recently as one week before the search, and that he had a "rocky" relationship with his sister, lessening his expectation of privacy in her home. This argument fails for several reasons. First, respondent failed to introduce the probation report, or even refer to it during the suppression hearing. Nothing in the record indicates that the juvenile court read and considered its contents, and we refuse to indulge in respondent's speculation to that effect. Second, even if the court considered the probation report, appellant's running away from home does not indicate an intent to permanently abandon the home or to give up his privacy expectation in it. The probation report does not indicate that appellant removed all of his possessions and intended never to return. Finally, at the time of the search, appellant had returned home and was again living there.

Respondent primarily relies on *People v. McPeters* (1992) 2 Cal.4th 1148 [9 Cal.Rptr.2d 834, 832 P.2d 146] (*McPeters*), *People v. Jenkins, supra,* 22 Cal.4th 900 (*Jenkins*) and *People v. Vasquez* (1983) 138 Cal.App.3d 995 [188 Cal.Rptr. 417] (*Vasquez*) in support of its lack of standing claim. These cases are inapposite. In *McPeters*, the California Supreme Court concluded that the defendant lacked standing to challenge the seizure of a gun where he, while an overnight guest in his relative's home, gave the gun to his cousin to hold for him. She put it in her bedroom under her pillow. The Supreme Court

stated that "although defendant owned the gun and was in the house by permission, he exhibited no concern whatever in knowing the specific place where it was to be kept; moreover, he failed to show he had any legitimate access to that place. He had no right to exclude others from his cousin's bedroom." (*McPeters, supra,* at p. 1172.) Unlike in *McPeters,* here appellant was not an "overnight guest," but a family member who resided with his sister, who was his guardian. The search was conducted in his home. Also, unlike the defendant in *McPeters,* appellant had access to his sister's room.

In *Jenkins,* the defendant's briefcase was seized from his sister's home. But he failed to establish any possessory interest or legitimate expectation of privacy in that home. Here, the items seized were within the home in which appellant resided with his family. This established his expectation of privacy.

*Vasquez* is wholly inapposite. It dealt with the expectation of privacy in closed containers, the court concluding that " 'a pillowcase—save for occasional use as a laundry bag—is not commonly used as a receptacle for items in which a strong privacy interest is manifest.' " (*Vasquez, supra,* 138 Cal.App.3d at p. 1001.) Privacy interests in closed receptacles are not involved in this case.

█ We conclude that all family members who reside in a home have a reasonable expectation of privacy from government intrusion in all areas of the home, even if internal familial rules restrict their use or access to certain areas. That some parts of a home may be the predominant domain of a particular family member does not diminish the expectation of privacy of other family members from government intrusion anywhere in the home. Family members do not ordinarily intend their internal rules and restrictions to set forth the bounds of privacy from government intervention. In any event, here there was uncontradicted evidence that appellant had access to the entire home and was not excluded from his sister's bedroom.

## III. *Inevitable discovery.*

Respondent argues that even if William M.'s consent was improperly procured and the search thereby invalid, the doctrine of inevitable discovery would have applied to the seized property. Respondent points to Deputy Calvo's statement that Evelyn F. asked him whether he had a warrant and that he could have someone remain at her house while he procured a warrant, as demonstrating that a warrant would have been obtained and the seized guns found. Respondent states: "Appellant has made no showing that a search warrant could not have been obtained for the premises." This contention is without merit.

■ The inevitable discovery doctrine provides that illegally obtained evidence is nevertheless admissible if it would have been inevitably discovered independent of the improper police conduct. (*People v. Robles* (2000) 23 Cal.4th 789, 800 [97 Cal.Rptr.2d 914, 3 P.3d 311].) As our Supreme Court articulated in *People v. Robles*: "Under the inevitable discovery doctrine, illegally seized evidence may be used where it would have been discovered by the police through lawful means. As the United States Supreme Court has explained, the doctrine 'is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.' [Citation.] The purpose of the inevitable discovery rule is to prevent the setting aside of convictions that would have been obtained without police misconduct. [Citation.] *The burden of establishing that illegally seized evidence is admissible under the rule rests upon the government.*" (*Id.* at pp. 800–801, italics added.) The test is not whether "the police would have certainly discovered the tainted evidence, rather, it is only necessary to show a reasonably strong probability that they would have." (*In re Javier A.* (1984) 159 Cal.App.3d 913, 928 [206 Cal.Rptr. 386]; see also *People v. Superior Court (Tunch)* (1978) 80 Cal.App.3d 665, 681 [145 Cal.Rptr. 795].)

■ Contrary to respondent's assertion, it is respondent, not appellant, that bears the burden of establishing that illegally seized evidence would have been obtained even without the illegality. The problem for respondent is that it never raised this issue in the trial court, and hence failed to make a record to establish it. The record is barren of any evidence as to the likelihood that the deputies would have been able to obtain a search warrant. The record does not indicate what information the People had regarding the stolen guns or how, and from whom, they obtained that information. Because there was no evidence on this point, respondent cannot establish that it would most probably have obtained a search warrant had the deputies attempted to get one and therefore discovered the stolen weapons.

## DISPOSITION

The orders denying appellant's motion to suppress evidence and declaring appellant a ward of the court are reversed and the cause remanded to the superior court with directions to vacate appellant's admissions of the allegations in the petition if he makes an appropriate motion within 30 days after this opinion becomes final. In that event, the court is directed to reinstate the

original allegations in the petition, if the People so move, and to proceed to trial or make other appropriate disposition. If appellant fails to make such a motion, the juvenile court is directed to reinstate the original order.

Nott, J., and Doi Todd, J., concurred.